UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES THOMPSON,

       Plaintiff,

                                   Case No. 03-74605

v.

                                   Honorable Nancy G. Edmunds

ROCHESTER COMMUNITY SCHOOLS,
ET AL.,

       Defendants.

_____/

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS [35]

This case concerns the death of Plaintiff's Decedent, Mary Elizabeth "Cady" Elkins, on the floor of the Rochester High School cafeteria on February 6, 2002. This Court has previously dismissed Plaintiff's state law claims against Defendants Rochester Community Schools and school employees Elizabeth Bentley, Pamela Semann, Mark Merlo, Penelope Burke, Robert Clark, Ilene Ingram, Charles May, Don May, and Linda Crowell. Defendants have now moved the Court pursuant to Rule 12(b)(6) for dismissal of Plaintiffs' claims under Section 1983. For the reasons discussed below, the Court DENIES Defendants' Motion to Dismiss.

**I.   Background**[1]

_____

    [1]The facts are derived from Plaintiff's Amended Complaint, and for purposes of this Motion to Dismiss, are presumed true. In responding to this Motion, Plaintiff has reached far beyond the pleadings to cite several deposition transcripts. Because Defendants have treated this as a 12(b)(6) Motion to Dismiss, however, and have therefore not presented any evidence of their own, the Court does not consider evidence outside of the pleadings.

At about 12:40 p.m. on February 6, 2002, Cady Elkins was standing in line at the Rochester High School cafeteria. Suddenly, for reasons unclear at the time, she collapsed. We now know that her collapse was caused by cardiac arrhythmia.

For some time after Ms. Elkins's collapse--approximately twelve to seventeen minutes, Plaintiff contends--she was left lying on the ground without medical assistance. Nobody called 911, attempted CPR, or used the Automated External Defribrillator kept at the school. Rather, with the exception of Defendant May, who attempted to clear Ms. Elkins's mouth, Defendants just watched and waited, as Ms. Elkins's condition worsened by the second.

Plaintiff alleges no malice or poor intentions on the part of Defendants. To the contrary, it appears that everybody was concerned with Ms. Elkins's safety, but that they believed that she was suffering a seizure and that it would be best not to intervene. Plaintiff alleges that Defendants followed this course of conduct even after learning that Ms. Elkins had no history of seizures.

Plaintiff alleges that Defendant Merlo advised others to "let it ride out," and "advised others on the scene not to render aid to Cady, or obtain aid for her (other than to have her lie there on the floor)." (¶ 35, 38.) Plaintiff further alleges that "Defendant Ingram advised others on the scene not to render aid to Cady and further advised the persons at the scene that she was in control and that everything was under control . . . ." (¶ 43.)

It is unclear exactly when, but Grace Patterson, a non-party to this lawsuit who was present during these events, eventually "decided, on her own, to call 911." (¶ 62.) Plaintiff alleges that the transcripts and tape from this 911 call demonstrate that Defendants acted "very recklessly," and "demonstrated a substantial lack of concern for the health and well

being of Cady Elkins, by laughing and having to be asked the same question about Cady's condition numerous times before they would respond." (¶ 65.)

When paramedics arrived on the scene, Ms. Elkins was not breathing and had no pulse. Attempts to reviver her failed. Plaintiff alleges that "as a direct result of Defendants' deliberate indifference to the health and well being of Cady Elkins, and their refusal to provide or obtain medical care for her, Cady Elkins' medical condition was allowed to deteriorate to the point that she died." (¶ 74.)

## II.   Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a Complaint. In a light most favorable to Plaintiffs, the court must assume that Plaintiffs' factual allegations are true and determine whether the Complaint states a valid claim for relief. *See Albright v. Oliver*, 510 U.S. 266 (1994); *Bower v. Federal Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996); *Forest v. United States Postal Serv.*, 97 F.3d 137, 139 (6th Cir. 1996). This standard of review "'requires more than the bare assertion of legal conclusions.'" *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997) (quoting *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995)). The Complaint must include direct or indirect allegations "respecting all the material elements to sustain a recovery under *some* viable legal theory." *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citations omitted) (emphasis in original).

## III.   Discussion

Plaintiff relies on the Due Process Clause of the Fourteenth Amendment as grounds for relief in this case. In his initial Response Brief, Plaintiff first argues that Defendants' "affirmative conduct caused the harm, and/or increased the risk of harm, and/or made Cady

3

Elkin's Situation worse." (Resp. Br. of Pl. at 11.)  Plaintiff next asserts that "Defendants deprived Cady Elkins of her civil rights by refusing to provide or obtain for her proper and timely aid and effectively preventing others from doing so." (*Id*. at 19.)  Plaintiff also contends that "Defendants had a constitutional duty to render affirmative aid to Plaintiff's decedent, as they exerted functional custody and control over her." (*Id*. at 20.)  Finally, Plaintiff argues that Defendant Rochester Community Schools is liable on account of its "failure to train and its policies and procedures which evidence their deliberate indifference to the rights of Cady Elkins." (*Id*. at 23.)

This case must be analyzed under *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), in which the Supreme Court cautioned that "the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation." *Id*. at 202.  Regarding state actors' duty to render aid, the Court noted,

> the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.  "Although the liberty protected by the Due Process Clause affords protection against unwarranted *government* interference . . . , it does not confer an entitlement to such [governmental aid] as may be necessary to realize all the advantages of that freedom."  If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them.

*Id*. at 196-97 (emphasis in original) (internal citations and footnote omitted).

In addition to *DeShaney*, Defendants cite a number of other cases addressing the issues presented here.  The Court finds *Sargi v. Kent City Board of Education*, 70 F.3d 907 (6th Cir. 1995), particularly helpful, as it presents similar facts:

4

Tami Sargi was a passenger on a school bus owned and operated by the Board when she collapsed due to heart failure.  Prior to this incident, plaintiff had advised school authorities that decedent suffered from a seizure disorder and Q.T. Syndrome, a heart condition.

When Tami collapsed, the bus driver tried to contact her garage on a C.B. channel but was unable to do so because the equipment was not working properly.  Believing that decedent was having a seizure, the school bus driver thought that medical attention was unnecessary and continued to take the other children who were on the bus to their homes.  At one of the stops, a neighbor approached with a portable phone, at which time the bus driver contacted the bus garage and told the secretary to contact plaintiff.  By the time the bus reached plaintiff's home, decedent was not breathing. Decedent fell into a coma and died three days later.

*Id.* at 909.

The plaintiff in *Sargi* raised essentially the same arguments that Plaintiff here raises. First, that a "special relationship" existed between the decedent and the defendants, such that the defendants had an affirmative duty to care for her.  Second, that the defendants acted purposefully or recklessly with a policy or custom exhibiting deliberate indifference to students' constitutional rights.   And third, that the defendants' acts or omissions constituted a "state created danger."  *Id.* at 910.

The district court granted the defendants' motion for summary judgment, and the Sixth Circuit affirmed.  The Sixth Circuit recognized that "compulsory school attendance does not restrict a student's liberty such that neither the child nor his parents are unable to attend to the child's basic human needs," and that this principle applied with greater force in the school bus context.  Thus, there was no "special relationship" between the decedent and the defendants.  *Id.* at 911.

Next, the court addressed the plaintiff's "deliberate indifference" argument.  The court noted that liability attaches only where policymakers make a deliberate choice to follow a

5

certain course of action, from among different alternatives.  The court held that there was

no evidence of the adoption of a custom, practice, or policy of taking students with seizures

home rather than obtaining medical assistance.  Moreover, because the defendants did not

have notice that students would be harmed by bus drivers' lack of seizure training, they did

not act with deliberate indifference in failing to train.  *Id.* at 912.

Finally, the court held that there was no "state created danger," because there was

no evidence that the defendants "took any *affirmative* action that exposed decedent to any

danger to which she was not already exposed.  Decedent's medical condition, not the

[defendants], created decedent's peril; defendants neither increased decedent's risk of

harm nor rendered her more vulnerable to heart failure."  *Id.* at 913 (emphasis in original).

While *Sargi* was decided on a motion for summary judgment, on a developed record,

this Court finds that much of its reasoning applies with equal force here.  Specifically, no

"special relationship" existed such that Defendants owed Plaintiff medical attention.

Moreover, just as the defendants in *Sargi* did not take any affirmative action to put the

plaintiff in danger, neither did Plaintiffs here.  Notwithstanding Plaintiff's attempts to color

the facts differently, Defendants cannot reasonably be said to have taken affirmative steps

to cause this tragedy.

But one issue addressed in *Sargi* is more difficult.  As to the plaintiff's argument that

the defendants acted with "deliberate indifference," the court analyzed in detail the

defendants' policies and practices, presumably because certain facts might have supported

such an argument.  This Court is therefore hesitant to hold as a matter of law that no set

of facts could support Plaintiff's argument.  Moreover, this issue seems related to an even

more difficult question, which Plaintiff has raised in a Supplemental Brief, represented by

new counsel. Specifically, Plaintiff argues that Defendants can be held liable for *preventing* others from rendering aid to Plaintiff without providing a viable alternative.

Plaintiff's argument relies upon *Beck v. Haik*, 2000 U.S. App. LEXIS 26768 (6th Cir. Oct. 17, 2000) (unpublished), in which the Sixth Circuit was faced with a similar factual scenario. The plaintiffs' decedent had jumped or fallen from a bridge into the Manistee River. Immediately, Police arrived on the scene quickly and summoned the county dive team. Also within moments, local volunteer divers arrived and sought to help. The police officers ordered the volunteer divers not to enter the water, and instead waited some thirty-five minutes for the county dive team. By the time the county dive team arrived and pulled the decedent from the water, it was too late. Evidence suggested that the volunteer divers could have saved the plaintiffs' decedent's life if the defendants had allowed them to intervene. *Id.* at * 3-7.

The Sixth Circuit ruled as follows:

> The plaintiffs . . . maintain that Eugene Beck was deprived of his life by an irrational government prohibition against private rescue efforts. This claim might prove to be meritorious, we believe, depending on how a jury ultimately assesses the evidence. . .
>
> [T]he Due Process Clause of the Fourteenth Amendment prohibits a state from depriving any person of life, liberty, or property without due process of law. Although its text might suggest that the clause was intended simply to require that fair procedures be followed in any such deprivation by the state, the Supreme Court has recognized that the clause also contains a substantive component that protects against "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). Courts should be "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended," *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992), but some constitutional limits do exist on the power of state governments and their political subdivisions to jeopardize human lives through implementation of arbitrary governmental policies.

7

Those limits were tested by a county anti-private rescue policy that allegedly contributed to the drowning of the plaintiff's decedent in *Ross v. United States*, 910 F.2d 1422 (7th Cir. 1990). In *Ross*, a case similar to this one on its facts, the defendant county was claimed to have "had a policy of arbitrarily cutting off private sources of rescue without providing a meaningful alternative." *Id.* at 1431. Observing that "the state cannot arbitrarily assert its power so as to cut short a person's life," *id.* at 1433, the Court of Appeals for the Seventh Circuit reversed a summary judgment that had been entered in favor of the county. Viewing the alleged facts in a light most favorable to the plaintiff, the Seventh Circuit concluded that "the plaintiff has sufficiently alleged that the county arbitrarily denied [the plaintiff's decedent] his fourteenth amendment right to life." *Id.* at 1430.

The Seventh Circuit would not quarrel, we assume, with the proposition that public safety officials should have broad authority to decide when civilian participation in rescue efforts is unwarranted. If police officials are not satisfied that would-be rescuers are equipped to make a viable rescue attempt, for instance, it would certainly be permissible to forbid such an attempt. It would not be irrational, similarly, to prohibit private rescue efforts when a meaningful state-sponsored alternative is available. But *Ross* holds that official action preventing rescue attempts by a volunteer civilian diver can be arbitrary in a constitutional sense if a state-sponsored alternative is not available when it counts--and we are constrained to agree.

*Id.* at * 11-13.

The Court agrees with Plaintiff that *Beck* provides strong Sixth Circuit authority for the idea that Defendants' failure to provide medical assistance to Plaintiff, while preventing others from doing so, could result in liability under Section 1983. This is especially true if Plaintiff can show that Defendants' policies and practices, which allegedly permitted the tragic outcome here, were motivated by a deliberate indifference to students' constitutional rights. In such circumstances, Defendants' conduct might be shown to be "arbitrary in a constitutional sense."

## IV.  Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons discussed above and on the record, the Court hereby DENIES Defendants' Motion to

8

Dismiss.  Resolution of the narrow issue before the Court requires the development of a factual record, and the Court therefore instructs the parties to pursue discovery and present evidence pursuant to Rule 56.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  April 11, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 11, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager