UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES THOMPSON, Personal
Representative of the Estate of Mary
Elizabeth Elkins,

        Plaintiff,

v.

ROCHESTER COMMUNITY SCHOOLS,
ET AL.,

        Defendants.

_____/

Case No. 03-74605

Honorable Nancy G. Edmunds

**ORDER GRANTING DEFENDANTS' MOTION SUMMARY JUDGMENT [55]**

    This lawsuit arises from the death of Plaintiff's decedent, Mary Elizabeth "Cady" Elkins,[1] after she collapsed while standing in the lunch line at Stoney Creek High School, Rochester, Michigan, on February 6, 2002.  Plaintiff's lawsuit is filed against Rochester Community Schools and the following school employees, in their individual capacities: Elizabeth Bentley, a special education para-professional; Pamela Semann and Penelope Burke, school hall monitors; Mark Merlo, a teacher/coach; Charles May, an administrative intern; Vice Principals Robert Clark and Ilene Ingram, Assistant Principal Linda Crowell, and Principal Don May.

    The only claims remaining in this Court are those brought pursuant to 42 U.S.C. § 1983, alleging that these Defendants violated Plaintiff's substantive due process rights as guaranteed under the Fourteenth Amendment.  This matter comes before the Court on

_____

    [1]The Court will refer to the decedent as Plaintiff.

Defendants' motion for summary judgment.  For the reasons discussed below, the Court GRANTS Defendants' motion.

## I.    Facts

On February 6, 2002, Plaintiff, a ninth grader at Rochester High School, arrived at school late.  She told her teacher that she was not feeling well.[2]  Two weeks earlier, she told a hall monitor, Defendant Pamela Semann, that she had missed a lot of school because she had not been feeling well.[3]  After class ended, Plaintiff went to lunch.

While waiting in the lunch line, Plaintiff collapsed to the floor and appeared to be having a seizure.[4]  Shirley Sweesy, the cafeteria manager, helped her to the floor.[5] Defendant Elizabeth Bentley, a special education para-professional who had received seizure management training and had worked with students who suffered from seizures, was in the cafeteria.  She immediately began to attend to Plaintiff by turning her to her side, clearing the area around her, removing her purse from her shoulder, timing her seizure and, because they cannot be stopped, letting the seizure run its course.  This was the procedure she had been taught for monitoring a student suffering from a seizure.[6]

The time was 12:43 p.m.[7]

---

[2]Gross Dep. at 28-29.

[3]Semann Dep. at 38-39.

[4]Bentley Dep. at 47-50; Sweesy Dep. at 39-43; O'Reilly Dep. at 27-28; Belland Dep. at 23-25; Burke Dep. at 34-36; Merlo Dep. at 23-25, 28.

[5]Belland Dep. at 23; Bentley Dep. at 36-47, 47-48.

[6]Bentley Dep. at 20-30, 36, 47-57; Burke Dep. at 62; C. May Dep. at 40; Semann Dep. at 42-43.

[7]Bentley Dep. at 36.

2

At 12:43 or 12:44 p.m., one of the cafeteria workers, Leigh Belland, called the school office, identified herself, told them that a student was down in the "A" lunch line, that they needed staff assistance, and that they needed EMS.[8]   The office switchboard operator/receptionist, Barb Springer, took the phone call.  She hung up the phone and looked at the clock.

It was between 12:44 and 12:45 p.m.[9]

Barb Springer immediately called Grace Preston, secretary to Assistant Principal, Linda Crowell, informing her that there was a student down in the cafeteria having a seizure.  The two offices are separated only by a fire wall.[10]

A student, Jennifer Dobbs, was in the lunch line behind Plaintiff.  She observed Plaintiff throw up and then fall down in the cafeteria line.   Jennifer then "went to the cafeteria eating area where she heard that someone was having a seizure.  After about two or three minutes she wondered if the person having the seizure was [Plaintiff] so she walked back into the food line to check.  When she saw that it was [Plaintiff] having the seizure she took out her cell phone to call 911.  When she got through to the 911 operator she was put on hold (she does not recall if the operator stated what department she was with).   Jennifer disconnected the call and called 911 again.  This time she got to talk and she told the operator the following:  'I am at the school at Tienken and Sheldon rds.  There is a student who is having a seizure in the cafeteria.  Please send help.'  Jennifer then

---

[8]Belland Dep. at 22.

[9]Springer Dep. at 21, 38.

[10]Preston Dep. at 10, 42-43.

disconnected the call before getting an answer from the operator." (Ex. U, Oakland County Sheriff Dept. Incident Report, page 11 of 20.)[11]

When Plaintiff first collapsed, Defendant Pamela Semann, a hall monitor, who was in the cafeteria, noticed the commotion, and went over to assist Ms. Bentley. She also radioed another hall monitor, Defendant Penelope Burke, telling her that there was a student down in the cafeteria and that they needed an assistant principal.[12]   Hall monitor Burke immediately went to the cafeteria and began to help para-professional Bentley with Plaintiff, propping her up on her right side while she was still seizing or convulsing.[13]   One of the hall monitors checked to see if Plaintiff was breathing.[14]

Defendant Mark Merlo, a school teacher/coach, was also present when Plaintiff was still seizing.[15]  Mr. Merlo had hall monitor Burke check Plaintiff's purse for her name so they could check her student emergency card in the office.  Someone from the cafeteria radioed to the office upstairs on the walkie-talkie to see if Plaintiff had a history of seizures, and were told that she did not.  Mr. Merlo then suggested that Plaintiff's parent be called.[16]

---

[11]The officer noted on his report that, after the interview, he checked with MSP Detroit and the OCSD communications.  There is no record of this call being received at either department.  He also reported that the student, Jennifer Dobbs, agreed to give him a copy of her cell bill when it became available.  (Ex. U, Oakland County Sheriff Dept. Incident Report, page 11 of 20.)

[12]Semann Dep. at 42-43.

[13]Burke Dep. at 34, 39.

[14]Bentley Dep. at 53, 59; Merlo Dep. at 22-23.

[15]Bentley Dep. at 54; Merlo Dep. at 23-24.

[16]Merlo Dep. at 25-26.

4

Cafeteria worker Sweesy overheard Mr. Merlo remark "it's a seizure, let it ride," and she felt Mr. Merlo's attitude seemed somewhat flippant at that time.  (Sweesy Dep. at 51-52.)

Grace Preston called Plaintiff's mother and then gave the phone to Assistant Principal Linda Crowell who told her about her daughter.  Ms. Crowell then reported that Plaintiff's mother was on her way to the school.[17]  Ms. Preston and Ms. Crowell continued to monitor the situation in the cafeteria via Ms. Crowell's walkie-talkie radio.[18]

After the cafeteria worker, Ms. Belland, called the school office, she returned to where Plaintiff was being attended to, saw that Plaintiff was still seizing, and saw that Vice Principals Ilene Ingram and Robert Clark were bent down checking Plaintiff.[19]  This was soon after Plaintiff collapsed.[20]  Mr. Clark immediately checked Plaintiff's pulse, and Dr. Ingram was talking to Plaintiff, trying to rouse her.  Mr. Merlo left the cafeteria at this point.[21]

During this time, cafeteria workers Sweesy and Charmley O'Reilly saw Plaintiff's face change color -- from red to blue to purple.  Cafeteria worker Sweesy, when she saw this color change, said out loud, "I don't think she's breathing."  This was probably around 12:45 p.m. (Sweesy Dep. at 52-54.)  Cafeteria worker O'Reilly said out loud to Sweesy a couple of times, "she's turning purple" and "something to the sort about when are they going to call 911."  (O'Reilly Dep. at 25-27.)  O'Reilly said no one responded to her; that "[t]hey were

---

[17]Preston Dep. at 42-43.

[18]Preston Dep. 43-44.

[19]Belland Dep. at 22, 24-25.

[20]Sweesy Dep. at 48-50.

[21]Merlo Dep. at 26-27.

5

busy." (O'Reilly Dep. at 27.) Teacher/coach Merlo recalls responding to a cafeteria worker that this coloring was not unusual for a seizure and that 911 was not needed. (Merlo Dep. at 29-30.) Cafeteria workers Sweesy and Belland overheard Vice Principal Ingram sternly say to someone that "we have it under control", or "we're handling it." (Belland Dep. at 31; Sweesy Dep. at 48.)

The seizure lasted at least four minutes.[22] After Plaintiff stopped seizing, she appeared to be in a state of deep-sleep, a pattern that Defendants had witnessed with others who had had seizures.[23] Also, based on their experience and observation of others suffering seizures, the color changes observed in Plaintiff's face were considered normal.[24]

Defendant Charles May, an administrative intern, came in the cafeteria, observed others attending to Plaintiff while she was in this state, and then left to attend to the other students.[25]

Vice Principal Clark observed that Plaintiff's chest was moving in and out and thus concluded she was breathing. He also took her pulse, at regular intervals, about four or five times, using the second hand of his wrist watch. The first time he took Plaintiff's pulse, it was fast -- 120 beats per minute. Each time he took it, it gradually declined. The last time he took it, it was slower -- 90 beats per minute -- and appeared weaker.[26] CPR was

_____

[22]Bentley Dep. at 55-56.

[23]Bentley Dep. at 59; Clark Dep. at 24-25.

[24]Merlo Dep. at 29; Bentley Dep. at 23-25, 65-66.

[25]C. May Dep. at 38-43.

[26]Clark Dep. at 55-56.

6

not performed because Plaintiff was breathing and had a pulse.[27]   No one attending to Plaintiff considered using a defibrillator device on her.[28]

When Plaintiff did not seem to be responding and her breathing appeared to become shallower, Ms. Preston, Ms. Crowell, Ms. Burke and Dr. Ingram each independently decided that 911 should be called.  Ms. Burke and Dr. Ingram were at Plaintiff's side.  Ms. Burke told Dr. Ingram that 911 was needed.[29]  Dr. Ingram told Ms. Crowell, over the walkie talkie radio, to call 911.[30]

Before she heard from Dr. Ingram, Ms. Preston was already on the phone dialing 911. No one told her to do it.  She did it as soon as she heard over the radio that Plaintiff was not responding.  As soon as she heard those words, she and Ms. Crowell looked at each other, realized what had to be done, and Ms. Preston picked up the phone and dialed 911.[31]  When the call came over the radio from Dr. Ingram, Ms. Crowell told her that they had already called 911.[32]

It was 12:54 p.m. when Grace Preston made the call to 911.[33]

---

[27]Clark Dep. at 70; Burke Dep. at 64.

[28]D. May Dep. 42, 141, 143; Clark Dep. at 22; Bentley Dep. at 71-73.

[29]Burke Dep. at 64.

[30]Ingram Dep. at 62; Crowell Dep. at 71-72.

[31]Preston Dep. at 44-45.

[32]Crowell Dep. at 71-72.

[33]Defs.' Ex. T, Transcript of 9-1-1 call.

7

Ms. Preston immediately informed the 911 operator that a student was having convulsions in the cafeteria, had passed out, and that they needed an ambulance.[34] Because there was no telephone in the area of the cafeteria where Plaintiff collapsed, Grace Preston would relay information from the 911 dispatcher to Ms. Crowell who would then relay it over the walkie talkie to Mr. Clark and Dr. Ingram, who were at Plaintiff's side in the cafeteria.[35]  It was confirmed that Plaintiff had a pulse, was breathing, but was unresponsive and her coloring was blue.  The dispatcher then instructed that Plaintiff be laid flat on her back with no support under her head and that someone must check in her mouth for food or vomit.[36] Ms. Preston relayed that those attending to Plaintiff were having trouble getting her mouth open.  It was then that Ms. Preston reported that she could hear the ambulance in the parking lot.[37]

When Principal Don May arrived in the cafeteria, he immediately inquired and was told that 911 had been called.  Vice Principal Clark informed Principal May that Plaintiff had a pulse.  Clark continued to check her pulse while Principal May was at Plaintiff's side.[38] Principal May observed that Plaintiff looked pale, and Vice Principal Clark agreed that her color did seem to be changing.[39] Principal May then got instruction from the 911 dispatcher

---

[34]Defs.' Ex. T, Transcript of 9-1-1 call.

[35]Preston Dep. at 50-54; Crowell Dep. at 75-76, 81; Clark Dep. at 67-68; D. May Dep. at 129, 132; Ex. T, Transcript of 9-1-1 call.

[36]Defs.' Ex. T, Transcript of 9-1-1 call.

[37]Defs.' Ex. T, Transcript of 9-1-1 call.

[38]D. May Dep. at 126-27.

[39]D. May Dep. at 128.

to check Plaintiff's airway for any obstruction.  Although it was difficult to open her mouth, he did so and found no obstruction.[40]

After Principal May had checked Plaintiff's airway, her mother walked in.  Dr. Ingram took Plaintiff's mother out of the room.  The EMS arrived immediately after Plaintiff's mother and took over attending to Plaintiff.[41]

It was approximately 1:00 p.m. when EMS arrived.[42]

The EMS paramedics immediately checked Plaintiff's pulse and her airway, and then began rescue breathing, CPR, and other advanced life support measures, including the use of a defribrillating device.[43]  EMS attendant Pavlicek believed that, based on Plaintiff's coloring, that she was not breathing for more than ten minutes before EMS arrived.  A device was used to clear Plaintiff's airway, and she was intubated.[44]

EMS transported Plaintiff to Crittenton Hospital.

At 1:46 p.m., she was pronounced dead.

The autopsy report lists her cause of death as Hashimoto's thyroiditis and complications thereof.[45]

---

[40]D. May Dep. at 129.

[41]D. May Dep. at 136; Clark Dep. at 57.

[42]Defs.' Ex. U, Oakland Cty. Sheriff Dept. Incident Report at supp. p. 1 of 20.

[43]D. May Dep. at 139; Harmer Dep. at 45-50, 70-73; Pavlicek Dep. at 34-47, 49-52.

[44]Pavlicek Dep. at 49-52.

[45]Defs.' Ex. X, Autopsy Report; Ex. Y, Death Certificate.

9

## II.   Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice.  Rather, there must be evidence on which the jury could reasonably find for the non-moving party.  *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.   Analysis

10

**A. No "Special Relationship" and No "State-Created Danger"**

In a prior Order [51] denying Defendants' motion to dismiss, this Court observed that this case must be analyzed under *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), in which the Supreme Court cautioned that "the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state action into a constitutional violation." *Id.* at 202. This Court also found *Sargi v. Kent City Board of Education*, 70 F.3d 907 (6th Cir. 1995), to be particularly persuasive here as it contained similar facts and claims that the school district and school employees violated the substantive due process rights of a student who had a seizure on a bus and subsequently died. (4/11/06 Order at 4.)

The plaintiff in *Sargi* raised essentially the same arguments that Plaintiff raises here. First, that a "special relationship" existed between the decedent and the defendants, such that the defendants had an affirmative duty to care for her. Second, that the defendants acted purposefully or recklessly with a policy or custom exhibiting deliberate indifference to students' constitutional rights. Third, that the defendants' acts or omissions constituted a "state created danger." *Id.* at 910.

The district court granted the defendants' motion for summary judgment, and the Sixth Circuit affirmed. First, the Sixth Circuit recognized that mandatory school attendance laws do not "restrict a student's liberty such that neither the child nor his parents are unable to attend to the child's basic human needs." *Id.* at 911. Thus, there was no "special relationship" between the decedent and the defendants.

Next, the *Sargi* Court addressed the plaintiff's "deliberate indifference" argument. It observed that liability attaches only where policymakers make a deliberate choice to follow

11

a certain course of action, from among different alternatives.  It then rejected the plaintiff's second argument, holding that there was no evidence that policymakers had adopted a custom, practice, or policy of taking students with seizures home rather than obtaining medical assistance.  The Court also rejected the plaintiff's failure to train argument because the defendants did not have notice that students would be harmed by bus drivers' lack of seizure management training and thus could not be found to have acted with deliberate indifference to the plaintiff's constitutional rights.  *Id.* at 912.

Finally, the *Sargi* Court addressed the plaintiff's state-created danger claim.  It held that there was no "state created danger," because there was no evidence that the defendants "took any *affirmative* action that exposed decedent to any danger to which she was not already exposed.  Decedent's medical condition, not the [defendants], created decedent's peril; defendants neither increased decedent's risk of harm nor rendered her more vulnerable to heart failure."  *Id.* at 913 (emphasis in original).

This Court, applying the reasoning of *DeShaney* and *Sargi*, determined that no "special relationship" existed such that Defendants owed Plaintiff a constitutional duty to provide medical attention.  (4/11/06 Order at 6.)[46]  It further determined that Defendants

---

[46]Plaintiff's new argument, that Defendant School District voluntarily created a "special relationship" lacks merit.  While it is true that Defendant School District owed a duty of reasonable care to its students under Michigan law and its District policies and regulations, Plaintiff cites no authority that would convert this state-law tort duty into a constitutional tort.  *DeShaney* and *Sargi* do not allow such an argument.   *See also Doe v. Claiborne County*, 103 F.3d 495, 510 (6th Cir. 1996) (observing that "[a]lthough, clearly, a school system has an unmistakable duty to create and maintain a safe environment for its students as a matter of common law, its *in loco parentis* status or a state's compulsory attendance laws do not sufficiently 'restrain' students to raise a school's common law obligation to the rank of a *constitutional* duty.") (emphasis in original).  The issue whether a constitutional duty arises is a question of law for the Court, not a question of fact for the jury.

here, like the defendants in *Sargi*, did not take any affirmative action to put Plaintiff in any more danger than that to which she was already exposed. Rather, like the decedent in *Sargi*, it was her medical condition, not Defendants who created her peril. *Sargi*, 70 F.3d at 913. "[D]efendants neither increased decedent's risk of harm nor rendered her more vulnerable to heart failure." *Id.* This Court observed that, notwithstanding Plaintiff's attempts to color the facts differently, Defendants cannot reasonably be said to have taken affirmative steps to have caused this tragedy. (4/11/06 Order at 6.) Accordingly, Plaintiff's substantive due process claims based on the "special relationship" and "state created danger" exceptions to *DeShaney* did not survive Defendants' motion to dismiss.

As this Court stated in its April 11, 2006 Order, the only claim remaining in this case is Plaintiff's claim, similar to that asserted in *Beck v. Haik*, No. 99-1050, 2000 WL 1597942 (6th Cir. Oct. 17, 2000), that Defendant School District had a policy, custom, or practice, motivated by a deliberate indifference to its students' constitutional rights, of preventing private medical assistance to students without providing a viable alternative. (4/11/06 Order at 7-9.) The Court now addresses this claim.

## B. No School Board Policy that Arbitrarily Cut-off or Prevented Private Medical Assistance Efforts and Thus No § 1983 Liability

To defeat summary judgment on her remaining § 1983 claims of municipal liability, Plaintiff must present evidence that Defendant Rochester Community Schools, the municipal Defendant, is responsible for a deprivation of her constitutional right to substantive due process under the Fourteenth Amendment. Plaintiff cannot base her claims against the Defendant School District solely on the individual Defendants' conduct because "*respondeat superior* is not available as a theory of recovery under section 1983."

13

*Doe*, 103 F.3d at 507 (citing *Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978)).  "Rather, she must show that the School Board *itself* is the wrongdoer."  *Id.* (emphasis in original).  "Under *Monell*, the . . . School Board cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom with the school district leads to, causes, or results in the deprivation of a constitutionally protected right."  *Id.*  Plaintiff must also "show that the particular [constitutional] injury was incurred *because* of the execution of that policy."  *Id.* (internal quotation and citation omitted).  "This requirement is necessary to avoid *de facto respondeat superior* liability explicitly prohibited by *Monell.*"  *Id.*

Thus, as the Sixth Circuit recently observed, to hold the municipal Defendant liable, Plaintiff must:  "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that [the plaintiff's] particular injury was incurred due to execution of that policy."  *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005) (internal quotation and citation omitted).

Plaintiff responds to Defendants' motion for summary judgment, arguing that the School District adopted policies and/or regulations that (1) "arbitrarily cut-off and hence prevented" private medical assistance efforts for seriously ill students; (2) punished those who attempted private rescue efforts; (3) were motivated by a deliberate indifference to its students' substantive due process rights; and (4) caused the deprivation of Plaintiff's substantive due process rights.  (Pl.'s Resp. at 8.)

To establish municipal liability, Plaintiff relies on two school regulations (one for professional staff, the other for support staff), adopted by the School Superintendent, that have identical language providing, in pertinent part, that:

14

If a student or staff member is injured or becomes seriously ill, the immediate concern is to give aid to that person.  A staff member present must assess the nature of the emergency and the need for assistance and immediately contact the administrator or supervisor in charge.  If available, the assistance of a trained first aid person in the building shall be obtained.  The building principal or responsible supervisor shall immediately:

1.  Initiate contact with the parents or legal guardian of any seriously ill or injured student.

2.  Obtain the assistance of a building first aid person in determining the seriousness of the injury.

3.  If it is determined that further medical assistance of an immediate nature is required, the nearest paramedic unit of the local fire department should be contacted.  The nature of the illness/injury should be made known and a support unit requested.  A building administrator or staff person shall meet the support unit at an agreed upon entrance to the location to the injured person.

(Pl.'s Ex. S, Regulation No. 3280.2, and Ex. T, Reg. No. 4280.2.)  Plaintiff also relies on another set of regulations (one for professional staff and the other for support staff) that requires all staff to "report to their immediate supervisor any accident and/or safety hazard." (Pl.'s Ex. U, Reg. No. 3280.1, and Ex. V, Reg. No. 4280.1.)  Plaintiff further argues that a District policy, practice, or custom exists to punish school staff that provide medical assistance or contact 911 without first obtaining the building principal's permission.  (Pl.'s Resp. at 10.)

Finally, Plaintiff argues that District policies exist that (1) preclude District students from using their cell phones to call 911 when they believe there is a health emergency, and (2) subject them to punishment if they do call 911 under such circumstances.  This policy, Plaintiff argues, is found in the Student Handbook, under Guideline 21, which provides that:

No student shall use or display information on pagers, portable telephones, or other electronic communication devices on school property during normal school hours except for health or unusual reasons previously approved by the

15

Superintendent/designee.  Students may not bring any object or materials which may be disruptive to the educational process.  The item will be confiscated and released at administrative discretion on first offense and to parent/guardian on any subsequent offense.

(Pl.'s Ex. O, Student Handbook, Guideline 21.)   This Court finds Plaintiff's arguments unpersuasive.

Even assuming Plaintiff can establish that the regulations at issue here were adopted by the Defendant School Board, thus making them District policy, Plaintiff's arguments fail.[47]  First, the plain language of the regulations clarify that any professional or support staff member in the presence of a seriously ill or injured student has the authority to immediately give aid and to assess the nature of the emergency and the need for assistance.  Although, the staff member is required to immediately contact the administrator or supervisor in charge, this does not prevent him or her from providing immediate medical assistance and does not subject the staff member to punishment for doing so.   In fact, para-professional Elizabeth Bentley and hall monitors Pamela Semann and Penelope Burke provided Plaintiff with medical assistance without Principal May's prior approval, and there is no evidence that they were punished for doing so.

---

[47]"Whether a particular official has final policymaking authority is a question of state law."  *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989).  Michigan's Revised School Code delegates to the School Board of a general powers school district all rule-making authority.  Mich. Comp. Laws 380.11a(3) and (6).  Bylaw 0130 of Defendant Rochester Community Schools' Bylaws provides that the "Board will exercise its rule-making power by adopting bylaws and policies for the organization and operation of the School District." (Defs.' Ex. BB.)  Based on the above, the final authority for adopting policy rests solely with the Board of Education as the official body.  Plaintiff has not provided the Court with any document showing that the Board has delegated its policymaking authority to the School Superintendent or any of the individual Defendants.

16

More importantly, although not required, there is nothing in these regulations that precludes, under threat of punishment, support staff from calling 911 or obtaining private rescue services without first obtaining the principal's approval. In fact, it was support staff, Grace Preston, that called 911 without Principal May's prior approval, and there is no evidence that she was punished for making that call.

Further, as Plaintiff concedes, Guideline 21 of the School Handbook has nothing to do with one student assisting another student. (Pl.'s Resp. at 11.) There is no evidence of a District policy that precludes or punishes a student that makes a call to 911 on his or her cell phone when that student believes there is a medical emergency at the school. In fact, there is evidence that a student, Jennifer Dobbs, did make such a call from her cell phone after witnessing Plaintiff suffering a seizure in the cafeteria lunch line, and there is no evidence that Jennifer Dobbs was punished for making that call.

Contrary to Plaintiff's arguments here, there is simply no evidence that the Rochester School District policymakers adopted a custom, practice, or policy of arbitrarily cutting-off and preventing private medical rescue attempts for students suffering seizures. Plaintiff's failure-to-train claims likewise fail because there is no evidence that, prior to Plaintiff's collapse in the lunch line on February 6, 2002, any of the Defendants had notice that a student who collapsed and appeared to be suffering from a seizure could be suffering from a cardiac arrhythmia that would require the use of an automated external defibrillator or CPR. (D. May Dep. 42, 141, 143; Clark Dep. at 22; Bentley Dep. at 71-73). Accordingly, Defendants cannot be found to have acted with deliberate indifference to the need for any training for the treatment of cardiac arrhythmia with an automated external defibrillator device or CPR. *See Sargi*, 70 F.3d at 912. As discussed above, because Plaintiff has not

17

established that the "special relationship" or "state-created danger" exceptions to *DeShaney* apply here, she cannot establish that Defendants had a constitutional duty to provide Plaintiff with medial assistance and cannot establish the deprivation of a constitutional right based on a failure to train school officials how to provide students with medical assistance.

Finally, Plaintiff's reliance on the Sixth Circuit's unpublished decision in *Beck v. Haik*, No. 99-1050, 2000 WL 1597942 (6th Cir. Oct. 17, 2000), is misplaced. Contrary to what was stated by the Court before the facts were developed, *Beck* does *not* provide strong authority for Plaintiff's claim that § 1983 liability can be established against Defendants for irrationally preventing private rescue efforts. First, unlike in *Beck*, there is no evidence that Defendants failed to provide any assistance to Plaintiff while preventing private rescue efforts. There is no evidence in the record that Defendants para-professional Bentley, hall monitor Burke, Vice Principal Clark, administrative intern Charles May, Principal Donald May, or Assistant Principal Linda Crowell turned down an offer to provide Plaintiff with medical assistance. The only evidence Plaintiff presents for this claim is testimony that (1) Defendant hall monitor Pamela Semann told a cafeteria worker and a student, offering the use of a phone to call 911, that it was not necessary at that time (Semann Dep. at 64-65); (2) Defendant teacher/coach Merlo, in response to a cafeteria worker's suggestion that 911 should be called, told her that the color change in Plaintiff's face was not unusual for someone suffering from a seizure (Merlo Dep. at 29-30); and (3) Defendant Vice Principal Ingram replied sternly that "we're handling it" or "we have it under control" in response to comments from concerned cafeteria staff (Belland Dep. at 31; Sweesy Dep. at 48). These facts are measurably different than those present in *Beck*.

18

The Sixth Circuit recently addressed *Beck* in a published decision, *Tanner v. County of Lenawee*, 452 F.3d 472, 480-81 (6th Cir. 2006). In *Tanner*, the police arrived at the plaintiffs' home in response to a domestic dispute call. The assailant was in his car, preparing to leave when the police arrived. He reacted to their arrival by forcing his way into the home, shooting his brother-in-law and sister-in-law, and then killing his wife and himself. The brother-in-law and sister-in-law sued the County, the police who responded to the 911 call, the County Sheriff, and the commander of the emergency response team, alleging *inter alia* that these defendants "deprived them of their constitutional right to substantive due process based on the manner in which the defendants handled the confrontation with [the assailant]." *Id.* at 474.

This Court was the district court that decided *Tanner*. *See Tanner v. County of Lenawee*, No. 03-71232, 2004 WL 4093478 (E.D. Mich. Dec. 9, 2004). It granted the defendants' motion for summary judgment, finding that the plaintiffs "had failed to demonstrate that their constitutional rights were violated." *Tanner*, 452 F.3d at 474. The Sixth Circuit affirmed this Court's decision.

In *Tanner*, the Sixth Circuit rejected the plaintiffs' argument that, by setting up a perimeter around their home, the police violated their constitutional right to substantive due process by "cut[ing] off a potentially lifesaving rescue, either by emergency personnel or anyone else." *Id.* at 480. The Sixth Circuit first observed that "there is no constitutional right to state-provided rescue services, so there was no constitutional violation in preventing publically employed medical personnel from entering the home to care for one of the plaintiffs. *Id.* (citing *DeShaney*, 489 U.S. at 196).

19

The *Tanner* Court then addressed the plaintiffs' reliance on the Sixth Circuit's unpublished decision in *Beck* as support for their argument that "preventing a private rescue can establish § 1983 liability." *Id.* at 480-81. It began by describing the facts and holding in *Beck*:

> In *Beck*, two men jumped or fell into the Manistee River in Michigan. Emergency personnel from the county arrived on the scene after receiving a 911 call from a witness. One of the men in the river swam to shore, but the officers saw the other man go under and not resurface. Two <u>trained</u> civilian rescue divers heard a report of the incident on their police scanner and drove to the scene. They told the officer in charge that they were prepared to attempt a rescue. but the officer told the divers that the government dive team had been summoned and for them not to enter the water, <u>even though the officer knew that the civilian divers were qualified to perform such a rescue dive</u>. Thirty-five minutes later, the government dive team arrived and recovered the body of the man shortly thereafter. The deceased man's estate sued the county and several officers.
>
> On appeal, this court held that there is "no constitutional right to state-provided rescue services," so the county did not violate any constitutional rights by having in place a policy whereby any underwater rescues by the government dive team must be authorized -- and therefore possibly delayed -- by the Sheriff. <u>But</u> the plaintiffs also argued that the county officials <u>irrationally prohibited private rescue efforts as well</u>. This court held that this private-rescue claim "<u>might</u> prove to be meritorious . . . depending on how a jury ultimately assesses the evidence."

*Tanner*, 452 F.3d at 481 (internal citations to *Beck* omitted and emphasis added).

The *Tanner* Court then observed that the case before it was "a far cry from the facts in *Beck*." *Id.* In *Tanner*, "there was <u>no comparable private rescuer on hand</u> who was prevented from entering the house to aid [the plaintiff]. Furthermore, any claim that the rest of the Tanner family or a passerby *could* have helped [the plaintiff] but for the actions of [the police officers] fails <u>because the officers would not have been aware of the would-be rescuer's qualifications</u>." *Id.* (emphasis added).

20

The *Tanner* Court also cited its previous rejection of a similar *Beck*-type argument in *Hermann v. Cook*, No. 03-5316, 114 Fed. Appx. 162 (6th Cir. Oct. 22, 2004). In *Hermann*, the police arrested a drunk man at an outdoor concert, handcuffing his hands behind his back. Upon learning that he was going to jail, the man ran and jumped into the river, and immediately disappeared and did not resurface. *Id.* at 163. The police called for EMS and the Fire & Rescue dive team. An off-duty certified diver with the Fire & Rescue dive team arrived on the scene but was waiting for his diving equipment to arrive. Another concert goer told the police that "he had water rescue experience and offered to jump" in and attempt a rescue, but the police would not let him do so. *Id.* The EMS and dive team arrived about 15 to 20 minutes after the incident. The off-duty dive team member assisted the rescue team in retrieving the man's body from the river. *Id.* at 164. The man's estate brought § 1983 claims against the City, alleging that "the police officers' failure to attempt a rescue and prohibiting a private citizen rescue" violated the dead man's substantive due process rights under the Fourteenth Amendment. *Id.*

The *Hermann* Court first rejected the plaintiffs' substantive due process claim based on an alleged failure to rescue, finding that the state did not have a constitutional duty to provide rescue services. It then addressed the plaintiffs' argument that § 1983 liability arose because the police not only made no efforts to rescue but also refused to allow a private citizen to attempt a rescue in the face of police inaction. *Id.* at 165. It observed that in one instance, *Beck*, the Sixth Circuit had held "that official action preventing rescue attempts by volunteer civilian divers can be unconstitutional." *Id.* The *Hermann* Court, like the *Tanner* Court, found *Beck* factually distinguishable. *Id.* at 166. "There, the police knew that the volunteer divers were trained civilian divers, and members of a dive team that was

21

under contract with the city.  Here, by contrast, the officers knew nothing of [the private rescuer's] purported qualifications."  *Id.* (emphasis added).  The *Hermann* Court, quoting *Beck*, observed that "'[i]f police officials are not satisfied that would-be rescuers are equipped to make a viable rescue attempt, . . ., it would certainly be permissible to forbid such an attempt.  It would not be irrational, similarly to prohibit private rescue efforts when a meaningful state-sponsored alternative is available.'"  *Id.* (quoting *Beck*, 2000 WL 1597942, at *4).

Similar to *Tanner* and *Hermann*, this Court finds *Beck* factually distinguishable and thus rejects Plaintiff's argument that Defendants can be subject to § 1983 liability for depriving Plaintiff of a constitutional right to substantive due process.  Unlike the defendants in *Beck*, Defendants here did provide medical assistance to Plaintiff.  Unlike the facts in *Beck*, there was no official policy and no state-actor that arbitrarily prevented a private rescuer, known by Defendants to be qualified and equipped to make a rescue attempt, from doing so.  Unlike the facts in *Beck*, Defendants here did not arbitrarily prevent, under threat of punishment, anyone from calling 911 or otherwise rescuing Plaintiff while Defendants stood by and did nothing.  Although Plaintiff claims more should have been done and sooner, this is not enough to establish that Defendants deprived Plaintiff of her substantive due process rights guaranteed under the Fourteenth Amendment.  *DeShaney*, 489 U.S. at 202.  Accordingly, Defendants' motion for summary judgment is granted, and Plaintiff's § 1983 claims are dismissed.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  October 23, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 23, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager